Case 25-1911, Lauren Bridges v. Maxum Indemnity Company, et al. Argument not to exceed 15 minutes for the plaintiff and 15 minutes to be shared by the defendants, 10 minutes and 5 minutes. Counsel, you may proceed for the appellant when ready. Good morning. May it please the court, Douglas Young on behalf of plaintiff appellant Lauren Bridges. I would like to reserve 3 minutes for rebuttal. Alright. Your Honor, I'm going to try and not dwell too much on the underlying dates and times because it's a very convoluted fact pattern below. But this appeal, in short form, arises out of the district court's Rule 12b-6 dismissal of plaintiff's complaint. That complaint sought declaratory judgment under 3 insurance policies and also alleged breach of contract under 3 insurance policies. In this case, the district court dismissed 2 of the 3 defendants. It dismissed the first defendant in time, the Maxum policy. The next policy period was a Starstone primary policy followed by an excess policy that was issued by Landmark American. We have the potential here for an inconsistent result because the Landmark excess policy at present has been dismissed from the case. Whereas it follows the form of the remaining defendant, the Starstone policy. And to remedy that and to try and bring this case back together, we entered into a tolling agreement with Starstone and then dismissed them without prejudice so that we could get a judgment to appeal the matter that brings us here today. But we were left with kind of a conundrum there because the policy upon which the excess policy Landmark relies remained in the case. It did not file a motion for 12b-6 relief. It, in fact, answered after the motions for 12b-6 were filed. So, Your Honor... But Landmark, would you agree that Landmark follows the Starstone policy? Yes, Your Honor. And it also does not apply until the Starstone policy is exhausted by payment. So we couldn't get to that test in this case prior to their dismissal. I would argue it was premature that Landmark basically should stand by until the issue is resolved with Starstone. Because if Starstone doesn't pay its policy limit, Landmark does not apply by its terms. Landmark also relies on the Starstone policy and its definitions, terms, etc. And it follows its form. It is arguing things in its motion for 12b-6 that, in fact, Starstone did not argue. It answered the complaint. So we're left with a little bit of a conundrum there. It's asserting things that the primary policy, the holder of those rights, did not assert. But if I may continue on. What we've got here is an underlying... These are all legal malpractice lawyers' professional liability policies, LPL policies. They're all claims made. The vast majority of lawyers' professional and most professional policies have been claims made for many years. Years ago, there used to be occurrence policies which allowed lawyers' professional liability cover and other professional liability covers. But those have primarily gone by the wayside. And that's an important distinction because, like the Stein case referenced in the pleadings, the Stein case is a seminal Michigan case which deals with the issue of claims made policies being different than occurrence policies. Claims made policies, the triggering event for coverage is when the claim was made. Whereas in occurrence policies, the triggering event is typically the wrongful act or the accident. So I do agree with the rationale in Stein. But I would distinguish it here because the Stein policy did not deal with extended reporting periods. In claims made policies, you are often given the option at the end of the policy period to extend the coverage for a period of time for an additional premium. That's what happened here with the McKean matter. When the Maxim policy was expiring, they chose to purchase an ERP, often called a tail in the insurance industry. And that was to provide coverage for events that had already occurred but which they did not know about. In this case, they purchased, and this is one of the ambiguities that I think required discovery and I think makes it plain that the district court kind of jumped the gun. I would concede that one or all of these defendants could possibly win on a Rule 56 motion after discovery and after we answer some of these questions. But that it was premature to dismiss them based upon competing interpretations of an insurance policy at the 12B6 stage. Would you agree that the Sandstone policy had a coverage term of May 2, 2019 to May 2, 2020? Yes, Your Honor. Would you also agree that the alleged misconduct occurred in June of 2018? Well, I would agree that one of the alleged errors occurred at that time period in 2018. But I would note for the court that the appeal of that error was filed during these policies and during the tail period and it was actually on May 16, 2019. So if there are any errors in the appeal, that would be within both the Starstone policy period as well as the landmark. And the earlier maximum tail period. Meaning the attorney malpracticed during the appeal? Yes, it is possible that they did not allege. But you didn't actually make that claim, have you? We tendered the claim as a result of the underlying case in total. We didn't allege a specific error. The specific error that we knew about at that time was the failure to respond to the motions for some reason. It happened before the policy period. Before the landmark and Starstone policy period, yes. But during the maximum policy period, that error did occur. So, if I can continue. I'd like to point out a couple of the ambiguities that I think relate to the reason that the 12B6 dismissal was premature. One of them, and I believe my opposing counsel for Maxim refers to this as the Scrivener's error. The extended reporting period endorsement that was purchased by the McKean firm refers to a supplemental extended reporting period. SERP. S-E-R-P. And it relates to the policy. It references you back to the policy. But the problem with that is the policy references an optional extended reporting period. Or ERP. So, we've got in the policy provisions that they reference to the section of the policy are not the same. So, at the very least, my question that I would have liked to have discovery on is, is there another policy or another endorsement that should have been attached to this policy? Was there an error in the underwriting aspect of either the claim, the OERP, or the policy itself on the Maxim side? Because those two things do not mesh up. Opposing counsel relates that to a Scrivener's error, but I think the court is aware and most insurance professionals are aware. These forms are highly regulated, reviewed, and oftentimes filed with regulators. This is not a simple misstatement in a letter or a brief that I could call a Scrivener's error. This is two forms that do not match up. There's not any real question that the extended reporting period was a two-year period that nobody questions what the two-year period was, do they? Well, no, Your Honor, but the issue that I have with that is the endorsement for the two-year period, which we all agree that was what was purchased, does not contain any terms or conditions. It just refers you back to the policy. So it says you purchased a supplemental extended reporting period. See the policy in these provisions, paragraphs. When you go to the policy, that's not there. And when you find the correct spot in the policy, it's referred to by a totally different name. So are you implying or seeking discovery to see if there is any such thing as a supplemental extended reporting period? Yes, Your Honor. I'd like an explanation for why these two forms don't match up. At least on the record, you have no indication or inference other than the different word that there is such a thing. As you said, their forms are standard and there is no such thing that's been filed with regulators using that phrase. Is that correct? Well, I'm not sure about what's been filed with regulators, Your Honor, since we didn't do discovery. I will note for the record that the SERP, the Supplemental Extended Reporting Period endorsement, the forms on the bottom left have a date that they were created. It's a 2012 form. The policy itself has those same dates. And it's a 2013 form. So my question is for discovery. Is there a 2013 or later SERP form for the policy? Or conversely, is there an optional extended reporting period endorsement in those years? Because both forms were in existence from 2012 and 2013. And this claim did not arise until the 2019 policy period. You know, let me ask you this. I mean, does any of this really make any difference? How does it help you in that, as I understand the basic problem out there, Section 1A of the policy, and it says if Bridges or McKean, let's say, I mean, Bridges has got all the rights McKean had, right, to pursue these policies. If there was a claim, if there was even a potential claim that was made during the policy period or the extended policy period, a claim, an actual claim made, then you'd be covered. And so your problem basically is that, yeah, but there wasn't a claim made until 2022, which is clearly after both the policy period and the extended policy period. So I gather, if I understand your real problem here is, all right, but there was a potential claim filed during the extended policy, extended reporting period, right? Yes, sir. The question is, is that enough to provide coverage? Because it wasn't a claim. A claim is defined as an actual claim for money damages, and clearly that didn't happen until, you know, after the Alaska Supreme Court had reversed and remanded, and this case was, all right, so you've got this potential claim that was filed after the policy period, during the extended reporting period, but then Section 7B of the policy says that you've got coverage, that notice has to be given to Maxim during the policy period to have coverage, and yet an actual claim wasn't filed during the policy period. So now how do you get around that? I mean, forgetting about this extended reporting period, how do you get around Section 7B's requirement that a claim, it has to be a claim filed during, I mean, it has to be a potential claim filed during the policy period to have coverage, and you didn't file a potential claim or McKean didn't or Bridges didn't during the policy period. They didn't do it until the extended reporting period. How do you get around that? Well, Your Honor, I think that we have to interpret the SERP endorsement with that Section 7, and you'll notice in that Section 7B it says, Notice of Claims or Potential Claims, and it also then goes forward to state Notice of an Actual Claim or Notice of a Potential Claim. They modify the word claim in two different ways there, and they allow for potential claims as opposed to actual claims. The definition of claim is a typical demand for money or services. Here we've got two types of claims that are in play, actual claims and potential claims. But don't even the potential claims have to be raised during the policy period? Or during the supplemental extended reporting period, or as the policy defines it, optional reporting period. Claims can be filed during the extended reporting period, but not potential claims. An actual claim made during the extended reporting period would provide coverage. But that didn't happen. Well, Your Honor, I'd respectfully say that the claim is defined, that actual claims and potential claims are modifiers within the policy that create an ambiguity. We've got two different types of claims now, not just the typical defined claim of. But there's no ambiguity as I read it. It's saying during the policy period you're not ready to make a claim, but the company needs to know that there might be a claim. Period. That you finish the reporting period and the company has no knowledge of anything, then the extended period, whatever you call it, doesn't do you any good. Isn't that the clear reading of it? You're right. They're two different things because if you're the lawyer, you're coming to the end of the period and you say, am I ready to make a claim? No, but I need to tell them of a potential claim. That's pretty straightforward. What's wrong with that? Well, Your Honor, I think that the SERP, or in the policy, OERP, does allow for the tendering of potential claims during the SERP period. And that's what was done here. So you're just saying if you read it, the part about having a potential claim during the policy period, you just don't read it that way? Well, yeah, I'm saying that provision also applies to the SERP because the SERP doesn't have any language. All right. Thank you, Your Honors. Good morning, Your Honors. Good morning. I'm Jonathan Fryman for Maxim. May it please the Court. I'd like to start with the last point. First of all, the big picture here, yes, the claim is made not only after the policy period, but also after the extended reporting period. And so any claim about ambiguity with regard to the synonyms of optional and supplemental is irrelevant because even if there were something else, it's acknowledged that it was two years of an extended period, and those two years elapsed before the claim was made here. That's fundamental. I agree with the opposing counsel that insurance in Michigan, as elsewhere for attorney malpractice policies, shifted broadly from occurrence to claims made policies. I also agree with the opposing counsel that Michigan has strongly respected claims made policies for professional liability coverage. The Stein and Lehrer cases recognize that. The Lehrer case goes back to the 1940s, I believe, and Stein is quite explicit about the policy advantages of claims made policies for the citizens of Michigan. So as a state law matter, there's no question that the Michigan Supreme Court strongly supports the strict application of the terms of claims made policies. This court, doing its duty in diversity, has said the same thing with regard to Ohio law in two different decisions, McCarty and A.C. Strip. And I would direct your attention to those cases especially. McCarty is a case, it's almost like a rerun of this one. It's a case where an attorney missed a deadline. In that case, it was an answer to a complaint. The result of the missed deadline is that the attorney's clients lost the case and therefore lost the money. And then there was a malpractice claim that was brought against that attorney. And what happened was that attorney had not, in fact, filed the requisite notice under the claims made policy. And this court in McCarty said, look, the attorney failed in the same way twice. They just missed deadlines and it's unfortunate that there's no coverage, but we have to apply these policies by their terms. They serve a purpose. That's what the state wants. The law of Ohio and Michigan in this regard is identical. They have the same respect for claims made policies. They both apply the usual rules. They apply the text, unambiguous text, directly. The A.C. Strip case, also that one is a published decision of this court, also applying Ohio law that is cited in McCarty. The A.C. Strip case is a case where the claim is made on time. It's made one week before the policy period ends, but it's not reported until two and a half weeks after the policy period ends. And this court in A.C. Strip in a published decision said, it didn't follow the policy. There's nothing we can do about it. The policy sets forth the agreement between the parties and that's it. So under these cases, Laird, Stein, A.C. Strip, and McCarty, I think there's no question here that there is no coverage. I want to turn for a moment to the notice of potential claim issue that was raised by opposing counsel. And I think with respect, that's nothing more than an effort to change the terms of the policy. What the notice of potential claim provision says in Section 7B, I'm turning to it so that I can look at it directly with your honors. But it's important. First of all, claim is a defined term. I'm sorry, I had the wrong provision there. Claim is a defined term. That's right in the definitions of the policy. Potential claim is not a separate defined term. You'll see that the word potential just comes before the quoted word claim when you look at 7B. But the language is quite clear. It says, if during the policy period the insured shall become aware of any wrongful act that may reasonably be expected to be the basis of a claim against the insured, and if the insured shall during the policy period give written notice to the company, then any such claim that may subsequently be made against the insured arising out of such wrongful act shall be deemed to have been made during the policy period. Okay, so it's a deeming clause. It says, all right, we know that wasn't made during the policy period, but if you do the right thing, if you follow the rules that are set out in this policy and you give us notice, then we're going to deem it made in the policy period if it comes later. But you have to do it in the policy period. The whole purpose of the claims made policies is to put a wrap around it, to be able to understand the liability, to set the reserves, to do the underwriting, et cetera. Stein recognizes that, the Michigan Supreme Court decision. So you need to know by the end of the policy period that that's why the insurer puts it in there. But in any event, the language is clear. During the policy period shall, et cetera. These are the requirements. These are the preconditions. So what happens here is you look at the endorsement, and there's, of course, an actual endorsement here that applies the extended reporting period, and that endorsement is on page 54 of Record Entry 1. It's the endorsement, as opposing counsel noted, that is dated 4-1-12, and it states that the supplemental extended reporting period has been purchased. And it says very clearly, the final line is, all other terms and conditions of this policy remain unchanged. So what are those other terms and conditions? Well, they're the definition of policy period, which is a specific period of time, a one-year period in the declarations of the policy. So policy period remains the same. What else remains the same? The notice of potential claim provision. It doesn't change. It doesn't get altered because you buy the extra two-year period to report a claim. You just now have two more years to report a claim. It doesn't say that you can now make a notice of potential claim, a notice of circumstances. That's all very clear in the policy, and I don't think there's anything here that requires discovery because based on the dates that are acknowledged in Bridges' complaint, the dates of the various events that happened in Alaska, those dates combined with the plain language of the policy makes it clear that the district court judge properly dismissed these claims under Rule 12b-6. What about just going to the landmark business and whether because it follows Starstone and Starstone didn't move to dismiss under Rule 12b-6 that there could be inconsistency and it may be triggering the wrongful acts. Some of them were maybe at the appellate level in Alaska. What's your answer to why it was appropriate to grant 12b-6 as to the landmark claim? Your Honor, the defendants have divided time in this argument. Mr. Bassett will respond on that question, I'm sure. If there are no further questions, thank you for your time, Your Honors. Good morning, Your Honors. May it please the Court. My name is Brian Bassett. I represent the FLE, Landmark American Insurance Company. Judge Gilman, I'll start with your question since that seems to be central. You're dumping the guns. Yeah, I appreciate it, Your Honor. There seems to be two issues at play here in your question. The first would be to what extent Landmark is bound to follow the litigation strategies of Starstone, and to that I would say Landmark has its own contract with McKean in place here. The plaintiff has sued Landmark on its own independent contractual obligations owed to McKean or allegedly owed to McKean. There's an umbrella policy. It's an excess policy that adopts the terms and provisions in large part of the underlying Starstone policy. So in essence, it incorporates the language in large part of the Starstone policy, but it still has its own independent contract with McKean. And that's what Bridges has sued on here. So it has asserted a claim directly and independently against Landmark based on its contractual obligations. To suggest that Landmark is therefore obligated to follow the fortunes of whatever Starstone decides to do in the underlying lawsuit is inconsistent with that assertion of an independent contractual right against Landmark. To illustrate the point, had Landmark answered the complaints and gone through discovery, and to the extent that it desired to file a motion for summary judgment, but Starstone for whatever reason decided not to do so, Landmark would similarly be precluded from filing a motion for summary judgment at that stage. Of course, that result would be nonsensical, and my opponent cites no citation for good reason that would support the notion that an excess carrier in litigation is bound to do whatever the primary carrier does. Those are two separate independent companies with two separate independent contracts. They cannot now suggest that we are bound to follow whatever litigation strategy is adopted by the Starstone policy. From a contractual perspective, I take it your argument is that the Landmark contract simply incorporates certain phrases, provisions of a separate document, which could be completely some other document that isn't even a contract. It says we incorporate provisions of the Gettysburg Address or whatever. It simply has nothing to do, it's a contractual phrasing. Is that really the thrust of the argument? That's accurate, Your Honor. That's simply correct. Simply because we adopt those provisions does not also mean that we have an obligation to follow what Starstone does. We cite in our brief a number of decisions where courts have recognized that excess carriers are not duty-bound to follow the interpretation of a primary policy simply because the excess policy recognizes and follows form to the primary policy. We believe that Landmark has every right to file a motion to dismiss and that the court properly addressed and ruled on that motion to dismiss, despite the fact that Starstone decided to not file a motion to dismiss. What about the merits? The merits of the argument, Your Honor, there's a couple of things at issue here. The first is that the plaintiff, Bridges, has cited no or referred to no alleged malpractice that occurred other than the dismissal of the underlying case. And as we explained in the brief, that was based on McKean's failure to file responses to motions for summary judgment filed at the trial court level in Alaska, which all occurred in 2018. That's well prior to the May 2019 retroactive date in the policy. And as the district court properly ruled, that retroactive date issue is dispositive and can be addressed at the pleading stage because clearly the allegations of malpractice concern wrongful acts, errors, and omissions that occurred prior to that retroactive date. I heard for the first time today, not even at the district court level, nor in the brief submitted to the court, I heard for the first time today my opposing counsel suggest that there may have been some errors committed on appeal. That's not in the record before the court, but even if it were, Your Honor, it would not change the result here. If you look at the language of both the Starstone policy exclusion and the landmark policy, they have important provisions that recognize that so long as any wrongful act was first occurred prior to that retroactive date, no coverage is available under the policy. The landmark policy definition of retroactive date states, and I quote, retroactive date means the date stated in item four of the declarations, on or after which any alleged actual negligent act, error, or omission must have first taken place in order to be considered for coverage under this policy. Similarly, the Starstone policy exclusion bars coverage for claims that are based upon, arising out of, directly or indirectly resulting from, very broad language, or in any way involving any wrongful act prior to the retroactive date or any subsequently related wrongful act. You're saying that, forget the trial problems, if the claim was simply and straightforwardly for malpractice on the appeal, it would not be covered? If there was some theoretical, and I see that my time is up. Yeah, I mean, I say they didn't do it, and that's why I don't know what it has to do with it, but on its face, it sounded like you were saying that there's no coverage for malpractice on appeal if it's an appeal that started earlier, and that wasn't quite the way I understood it. Is that the claim? My argument, Your Honor, is that the basis for the dismissal of the Interline case was the failure to respond to the motions for summary judgment by McKean, and even if that was perpetuated through the appeal, the allegations in this claim and the allegations that Bridges brought against McKean concerned that failure to file responses to the motions for summary judgment, and therefore, at the very least, the access... But that's because the issue that if the malpractice was the handling... I guess the thing that I'm... and maybe it's not relevant. If this case was just a fine old case, and then on appeal, they simply didn't show up in court to argue the appeal, there'd be no coverage for that malpractice? If it was solely a basis to pursue a malpractice claim on appeal, which is, again, a hypothetical. I'm not sure what that would be based upon, and there was no allegations of malpractice in relation to the trial court proceedings, that would be a different analysis. Okay, that was my... That's correct, yeah. But my point being that certainly, at the very least, the allegations are that the malpractice started at the trial court level. Thank you, Your Honors. Thank you. We'll have our bottle. Yes, Your Honors. A couple of very brief points. One is, if we go to the policy, and that's at the record one, page 30, the optional extended reporting period says, you shall have the right upon the payment of the additional premium options set forth in the declarations to an extension of the coverage provided under this policy for the terms set forth in the declarations following the effective date of such cancellation or non-renewal. This was a non-renewal. But only with respect to claims, in quotes, a defined term, for, quote, wrongful acts committed before the effective date of such cancellation or non-renewal. It does not say, but only with respect to claims made during the OERP. It says, but only with respect to claims for wrongful acts committed before the effective date of such non-renewal. So that would be the end of the maximum policy. That's what, in fact, happened here. And then they go on at the end of that paragraph to state, the fact that such period during which claims, in quotes again, may be reported to us under this policy is extended by virtue of the automatic and optional extended reporting periods does not in any way increase the limits of liability. So they've acknowledged that claims for wrongful acts prior to the non-renewal of the policy can be reported during the OERP. That would apply to both potential and actual claims because they use those phrases in the policy. They don't say actual claims. They don't define actual claims. They don't define potential claims. They only define claims. The other point I wanted to make is when this claim was tendered to Maxim, they wrote a reservation of rights letter on July 27, 2020. I don't have the record reference for that. I apologize, but it is in the record. And in that letter, they state, as provided above, the optional ERP is intended to apply to claims. It doesn't say it does apply to claims. It says it is intended to apply to claims. Their intentions are the subject of my future discovery. Please note Section 2 definitions of the policy defines a claim as a written demand for monetary damages arising out of or resulting from the performance or failure to perform professional services. We recognize that the current matter does not constitute a claim as defined in the policy. Therefore, if a claim is made against McKean in the future, Maxim reserves its rights with regard to the application of the insuring agreement and or the optional reporting period. Then going on a little farther down on that page, page 2, sorry, page 3, it says, please note that this letter is not an attempt to avoid any responsibilities under the policy. Accordingly, if a claim subsequently arises out of the circumstances described above, it will be considered for purposes of evaluating insurance coverage under the May 2, 2018 to May 2, 2019 policy period. Since we have not been advised that a claim has been made against McKean, we will close our file at this time. If you have any reason why this file should not be closed, please let us know immediately. So they've acknowledged that a potential claim, or in this letter referenced as a circumstance, has occurred and that this policy, the OERP, will apply to a future claim that is made. They don't say that a claim must be made prior to the expiration of the OERP in nine months. They say if a claim ever develops, let us know. So I think that is an issue for further discovery and potentially an argument for waiver later on. But I never got to any of those things because of the status of the case. And finally, I'll note with regard to landmarks and the issue of whether landmark was aware of this claim or whether the appellate errors potential, which I didn't get discovery on, could potentially impact this claim, Bridges' February 18, 2022 claim letter to McKean does not reference only the dismissal of the case and the denial of a motion for reconsideration. It does not say what the errors were that she was alleging were professional malpractice. Thank you, Your Honors. Thank you. Case shall be submitted.